UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| Mr. José Sala-Colón, Mrs. Melanie Rosselló-Wirshing, individually and through their conjugal partnership, and José M. Sala Colón Retirement Plan.<br><br>Plaintiffs<br><br>v.<br><br>Francisco José Rivera-Fernández and Jane Doe I and their conjugal partnership, Javier Fernando Reyes-Colón and Jane Doe II and their conjugal partnership, Pariter Wealth Management Group, LLC, Pariter Securities, LLC, Pariter Risk Management, Inc., Pariter Advisors, LLC, Arkadios Holdings, Inc., Arkadios Capital Group, Arkadios Wealth, Inc., Select Wealth Advisors, LLC; et al, Insurance Co. "X" and "Y".<br><br>Defendants | CIVIL NO. _____<br><br><br>Section 10(b) of the Act and Rule 10b-5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. 1.<br><br><br>Plaintiffs demand trial by jury |

## **COMPLAINT**

TO THE HONORABLE COURT:

Come now Plaintiffs Mr. José Sala-Colón, Mrs. Melanie Rosselló-Wirshing, individually and the conjugal partnership comprised among them, and the José M. Sala Colón Retirement Plan ("Plaintiffs"), through their undersigned attorneys and very respectfully state, allege and pray as follows:

## I. NATURE OF THE ACTION AND JURISDICTION

1.1.    This Court has jurisdiction over this action because it involves violations of federal law, specifically Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, as well as Section 20(a) of the Act, codified at 15 U.S.C. §§ 78a et seq. and 78t(a).

1.2    The Court has also supplemental jurisdiction under 28 U.S.C. § 1367 over all remaining parties and claims in this case, as the claims against those parties share a common nucleus of operative fact with the claims that pose a federal question.

1.3 Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred within this judicial district.

## II. THE PARTIES

**A. Plaintiffs**

2.1    Plaintiff **Jose Sala-Colón ("José")** is a 69-year-old individual born in Ponce, Puerto Rico. He has been married to Co-Plaintiff Ms. Melanie Rosselló-Wirshing ("Melanie") since 1978, and they reside in Guaynabo, Puerto Rico. José is the father of three adult children and the grandfather of three. José holds a Bachelor's degree in History from Villanova University and an MBA in Marketing from Columbia University (1979). His professional career includes:

- 1981–1989: Advertising executive at Young & Rubicam.

- 1990–2005: Founder and owner of Sala Creativa, an advertising agency.

- 2005–2010: General Manager of WHTV, a family business in the communications and broadcasting industry.

- 2010–present: Manager of Sala Business, a family-owned company overseeing real estate properties in southern Puerto Rico, primarily in Ponce.

- 2018–2023: Marketing consultant for co-defendant Select Wealth Advisors.

José is also a board member of various local nonprofit organizations and is officially retired. Throughout his career in marketing and business management, he has been involved in several music-related projects, including radio program Disc Jockey, Concert and Jazz Festival productions and, more recently, volunteering in community music education for kids on the island and Municipality of Culebra.  José appears in his personal capacity and as a representative of the co-plaintiff José M. Sala Colón Retirement Plan.

    2.2    Plaintiff **Melanie Rosselló-Wirshing ("Melanie")** is a 68-year-old individual born in Ponce, Puerto Rico. She has been married to Co-Plaintiff José since 1978, and they reside in Guaynabo, Puerto Rico. Melanie holds a Bachelor's degree from Georgetown University. Her professional experience includes:

- 1978–1980: Administrative assistant at Banco de Ponce.

- 1981–1983: Relationship manager at Chase Manhattan Bank.

- 1990–2005: Executive assistant and general accounting manager at Sala Creativa (part-time and intermittently).

After the birth of her first child in 1983, Melanie became a stay-at-home mother. Between 1988 and 1992, she briefly worked as a preschool teacher assistant (two semesters) and a relationship manager assistant (six months), resigning both roles to focus on raising her three children. In the late 1990s, once their youngest child entered middle school and José's agency expanded, she resumed part-time work in administrative and accounting roles at Sala Creativa. Neither Melanie nor Jose are sophisticated investors or experts in

securities, financial markets, alternative investments or insurance products tied to financial byproducts. Their address is Urb. La Villa de Torrimar, Reina Isabel #10, Guaynabo, PR, 00969.

2.3    Plaintiff **Jose M. Colón is a Retirement Plan**, known as a 401(k) plan under the Internal Revenue Code, EIN 66-0476837. Its address is Urb. La Villa de Torrimar, Reina Isabel #10, Guaynabo, PR, 00969.

**B. Defendants**

2.4    Defendant **Francisco José Rivera-Fernández** ("Mr. Rivera"), (CRD#: 2303039), an individual who is the owner and principal member of both **Pariter Securities, LLC** (CRD#: 127836), a broker-dealer located at 243 Carr. #2, Guaynabo, PR 00966, and **Pariter Wealth Management Group, LLC** (CRD#: 146622), an investment adviser located at the same address; (ii) **Jane Doe I** (identity currently unknown), who is married to Defendant Mr. Rivera; and (iii) **their conjugal partnership.**

2.5    Defendant **Javier Fernando Reyes-Colón**, CRD#: 3014365, is an individual who works for Defendants **Select Wealth Advisors, LLC** and/or **Arkadios Wealth Advisors** (CRD # 288863), investment advisers and/or **Arkadios Capital, MSY Securities, LLC**, (CRD#: 282710/SEC#: 8-6972), a broker dealer, located at 2827 Peachtree RD NE, Suite 510, Atlanta, GA 30305 ("Mr. Reyes"), (ii) **Jane Doe II** (currently unknown), who is married to Defendant Mr. Reyes, and (iii) their **conjugal partnership**.

2.6    Defendants **Pariter Wealth Management Group, LLC, Pariter Securities, LLC, Pariter Risk Management Inc., and Pariter Advisors LLC** are corporations organized and existing under the laws of the Commonwealth of Puerto Rico, with their principal address at #243 Carr. 2, Villa Caparra, Guaynabo, PR 00966-1915 (collectively

referred to as "Pariter"). Pariter is a registered investment advisor and/or securities brokerage firm regulated by FINRA, the SEC, and local agencies.

2.7     Defendant **Select Wealth Advisors, LLC ("SWA")** is a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, with its principal address at 322 Ave. José de Diego, Suite 202, San Juan, PR 00920. SWA is a registered investment advisor and/or securities brokerage firm regulated by FINRA, the SEC, and local agencies.

2.8     Defendants **Arkadios Holdings, Inc., Arkadios Capital Group, Arkadios Wealth, Inc., and Arkadios Capital, LLC** are corporations organized and existing, presumably subject to discovery, under the laws of the State of Delaware, with their principal address at 309 East Paces Ferry Road, Suite 1000, Atlanta, GA 30305 (collectively referred to as "Arkadios"). Arkadios is a registered investment advisor and/or securities brokerage firm regulated by FINRA, the SEC, and local agencies.  According to SWA's own website, its securities business is offered through Arkadios Capital, a member of FINRA/SIPC, while its advisory services are offered through Arkadios Wealth, Inc. SWA and Arkadios Capital/Arkadios Wealth are affiliated through common ownership. https://selectwa.com/.

2.9     Defendants Insurance Co. X and/or Y's names are currently unknown and their addresses are also currently unknown.

## III. FACTS

### A. Introduction

3.1    José and Melanie, a married couple approaching their early 70s, have been together for over 46 years. Through years of hard work, disciplined saving, proceeds from the sale of the family communications business, and an inheritance from José's late father (who passed in 2005), they had accumulated $5,953,246 by 2008. Between 2009 and 2017, they invested their entire life savings with Pariter.

3.2    Plaintiffs chose to invest their savings with Pariter because Pariter presented itself as a boutique firm distinct from others. Pariter assured Plaintiffs that it would: (i) adhere to a strict fiduciary standard, emphasizing that as a registered investment adviser, it was legally required to prioritize clients' interests above all others, including its own, (ii) charge only a fixed fee for compensation, and (iii) neither charge nor take commissions under any circumstances.

3.3    In 2017, Mr. Reyes decided to leave Pariter. Plaintiffs followed Reyes and followed suit, and since late 2017, they have entrusted their investments to SWA. SWA offers and offered securities through Arkadios Capital and provides advisory services through Arkadios Wealth, Inc., both of which operate under common ownership. See Paragraph 2.8.

3.4    What was once a small fortune of approximately $6.75 million—including the original amount plus $850,000 of new money that José and Melanie directly contributed in 2021 and 2022 to pay off the loans—has been reduced to nearly half, or around $3.6 million. This decline is the direct result of the self-serving and unsuitable advice provided by Pariter, SWA, and Arkadios. The losses stem from overconcentration,

unnecessary and predatory multi-million-dollar loans (now fully repaid), and other poor financial practices—all of which were recommended, implemented, and executed by Defendants. Ironically and paradoxically, during this past decade, all major U.S. capital market indexes have more than doubled: (i) Dow Jones: 146%; (ii) Nasdaq: 312%; and (iii) S&P 500: 192%. In other words, while regular investors have seen their portfolios more than double in value, Plaintiffs' portfolio has been slashed to less than half.

3.5     Nearly half of the Plaintiffs' savings were invested in a whole-life insurance policy that immediately generated a commission for Pariter ranging from 30% to 50%, amounting to approximately $600,000 to $1,000,000. According to MassMutual's own website:

> The primary component of this compensation is a commission, which is calculated based on detailed commission schedules. Generally, a commission is determined by applying a certain percentage rate (which varies based on the product type) to the premium, deposit, or asset value of the product(s) you purchase. **The commission paid for the placement of insurance is typically larger in the first year than it is in subsequent years**.[1] (Emphasis added).

3.6     Pariter assured Plaintiffs that purchasing a whole life insurance policy for $2,000,000 would guarantee a death benefit of at least $7,000,000 by the year 2040. In selling this policy, Pariter made a fraudulent and egregious misrepresentation by falsely promising that no additional premium payments would be required for the remainder of the policy's life.

3.7     In a March 11, 2013 email, Defendant Mr. Reyes explicitly confirmed to Plaintiffs that no further premium payments would be necessary to achieve a $7,000,000

---

[1] https://greaterphiladelphia.massmutual.com/-
/media/074%20understading%20your%20compensation%20and%20benefits.pdf;
https://www.massmutual.com/global/media/shared/doc/ak_disclosure.pdf.

to $10,000,000 payout (depending on José's life expectancy). This could not have been further from the truth, as later events narrated below will demonstrate.

3.8    To make matters worse, 35% to 40% of the remaining portfolio was allocated to highly illiquid and risky investments, including oil, REITs, and private equity. Approximately $2,600,000 was invested in these illiquid and unmarketable positions, many of which have either gone bankrupt, were sold at deep discounts, or lack a viable secondary market for liquidation.

3.9    Additionally, most of these assets were either never properly priced or were not marked-to-market, further obscuring their true value. Some of these investments included:

| Year + Investment | Amount |
|---|---|
| 2010 De Bartolo | $500,000.00 |
| 2011 Romark<br>    Rice Energy | $150,000.00<br>$93,000.00 |
| 2013 Benefit Street<br>    Virtus<br>    Epoch<br>    ARC REIT<br>    ARC Realty<br>    Epoch/Cobalt<br>    Phillip Edison | $150,000.00<br>$50,000.00<br>$50,000.00<br>$150,000.00<br>$150,000.00<br>$250,000.00<br>$25,000.00 |
| 2014 Coqui<br>    ICAP<br>    ARC Global<br>    ARC Retail | $250,000.00<br>$200,000.00<br>$20,000.00<br>$10,215.00 |
| 2015 GPB Cold Storage<br>    GPB Automotive<br>    Mill Green<br>    ICAPII Pacific | $130,000.00<br>$50,000.00<br>$50,000.00<br>$50,000.00 |
| 2016 Walton Street<br>    GPB Cold Storage | $50,000.00<br>$50,000.00 |
| 2017 Leitloc Self Storage<br>    GPB Holdings | $50,000.00<br>$100,000.00 |
| 2018 Harbor Light | $50,000.00 |
| **TOTAL investment in highly illiquid, risky securities** | **$2,628,215.00** |

3.10    Because of: (i) the immediate losses sustained in these highly illiquid and risky investments, (ii) the illiquidity of the whole-life insurance policy, (iii) the $260,240 in hidden premium payments required to keep the whole-life insurance policy active—despite prior misrepresentations to the contrary, and (iv) Plaintiffs' monthly disbursements of $10,000 to $15,000, Pariter, through Mr. Rivera and Mr. Reyes, induced Melanie and José to take a predatory $2,000,000 loan in 2014 to sustain Defendants' Ponzi-like scheme.

3.11    Plaintiff's subsequent financial advisor, SWA, later advised them to renew the predatory loan under similar exploitative terms. Unaware of the full scope of the financial mismanagement, José and Melanie initially declined to take the loan. However, over several months, Mr. Rivera and Mr. Reyes insisted, pressured, gaslighted, and persistently argued that taking the loan was not only a smart financial move but also a mistake not to take advantage of such "favorable terms." They even went so far as to claim they "should be fired if they couldn't outperform the interest rate" and reassured Plaintiffs that the loan could be repaid at any time through the sale or IPO of the "soon-to-go-public" investments.

3.12    By 2019, at maturity, the loan had ballooned to $3,300,000, and Mr. Reyes, now at SWA, once again advised them to renew the predatory loan terms. José and Melanie signed.

3.13    By the summer of 2021, as the Plaintiffs' financial situation deteriorated in ways they were completely unaware of, SWA engaged in a blatantly deceitful maneuver. During a formal presentation, SWA falsely represented to the Plaintiffs that they held

approximately $9,000,000 in "total liquid assets" and a total net worth of $10 million (including real estate).

3.14    During this same year, 2021, Plaintiffs used newly acquired funds to reduce the loan balance by $850,000 while repeatedly insisting that SWA develop a structured loan repayment plan. However, SWA failed to act diligently in addressing this request and, instead, persisted in encouraging them to continue with the loan.

3.15    Finally, the truth came to light in an email sent by an employee of SWA, Julio Díaz, to José and Melanie on May 19, 2023—after the Plaintiffs had fully repaid the predatory margin loans. In this email, SWA disclosed the actual state of their portfolio: only $371,000 remained, with $3,400,000 in cash value tied to the whole-life insurance policy. This shocking revelation exposed a **staggering $6,000,000 discrepancy** from the figures falsely presented in 2021.

**B.    Relevant Facts, Pariter**

3.16    In 2009, Jose received an inheritance of approximately $4.7 million following the sale of the family's telecommunications business. By that time, the Plaintiffs had also accumulated an additional $1.2 million in personal savings, bringing their total to approximately $6 million.

3.17    Always prioritizing the well-being of their children and grandchildren, Plaintiffs entrusted their entire savings to Pariter. They engaged the firm's President and Managing Partner, Mr. Rivera, and, together with Mr. Reyes, who served as their primary point of contact, their financial relationship began. The Plaintiffs conveyed two clear and simple objectives to Pariter:

(i)  To secure their children's financial future after their passing, and

(ii) To ensure a steady monthly allowance of $15,000 to cover their living expenses.

Their ultimate goal was to guarantee long-term financial stability for their family while avoiding any financial burden on their loved ones. Plaintiffs relied on three key representations made by Pariter:

- That Pariter would act as a fiduciary, prioritizing Plaintiffs' best interests,

- That compensation would be fee-based, aligning the interests of Defendants with those of Plaintiffs, and

- That no commissions would apply.

3.18    Plaintiffs placed their full trust in Defendants Mr. Rivera and Mr. Reyes, believing in their assurances that the investment strategies selected for their lifelong savings would successfully achieve their goals. Lacking expertise in financial markets—especially in complex and sophisticated insurance products—José and Melanie relied entirely on Pariter's representations.

3.19    In return, Pariter requested two things: (i) a $2 million check to purchase a whole-life insurance policy, purportedly to fulfill the Plaintiffs' first objective, and (ii) that Plaintiffs sign extensive paperwork, which Pariter's back office had prepared. Much of this paperwork was left blank, and its immediate effect was to establish a discretionary account with no restrictions. Unfortunately, Pariter treated this account as a free-for-all, recklessly speculating with Plaintiffs' money.

3.20    Plaintiffs trusted their new brokers to ensure the continuity of their monthly allowances while safeguarding their children's financial future. As they prepared for

retirement and gradually stepped away from the demands of daily life and work, Pariter's promises appeared to align perfectly with their needs and expectations.

3.21    However, by 2011 and 2012, Plaintiffs were unexpectedly required to make two additional payments of $260,000 each—within less than two years—to keep the whole-life insurance policy active. When Plaintiffs questioned these additional payments, Pariter, through Mr. Rivera and Mr. Reyes, reassured them "not to worry" and falsely promised that these would be the last two premiums ever required. In fact, on March 11, 2013, Defendant Mr. Reyes explicitly confirmed to Plaintiffs that these two payments were final, stating: "By the third year, the policy is paid." ("Ya para el tercer año la póliza está paid up").

3.22    By 2013, Plaintiffs suffered significant portfolio losses, including $546,000 completely wiped out in what Pariter labeled a "high/low instrument". When Plaintiffs questioned how such a substantial loss could occur so quickly, Pariter deceived and appeased them with a two-fold explanation. First, they reassured Plaintiffs not to worry, claiming that other investments had exponentially increased in value—despite relying on fabricated valuations. Second, they introduced what would later become a recurring excuse and scapegoat in the following years: "Romark", a private equity alternative investment, would supposedly go public and generate a tenfold return.[2]

3.23    These promises never materialized. By 2014, Defendants had deceitfully allocated 85–90% of the portfolio in an underfunded whole-life insurance policy and highly illiquid, overconcentrated, and high-risk investments. Thus, Pariter persuaded the Plaintiffs to inject additional capital into their portfolio. This time, Pariter urged and insisted

---

[2] [https://www.romark.com/]

that Plaintiffs take out a loan, presenting them with more blank paperwork to sign. Plaintiffs ultimately signed a Promissory Note for $2,000,000 at Pariter's urging. To justify this predatory loan, Pariter, through both Mr. Rivera and Mr. Reyes, falsely assured Plaintiffs that "interest rates are so low that with almost any investment, we can make a profit through arbitrage (the spread)."

3.24    In other words, Pariter misled Plaintiffs by promising that these borrowed funds would be invested at a return much higher than the interest being paid on the loan, making it a supposedly risk-free opportunity.

3.25    In clear breach of their fiduciary duties and as part of their continued pattern of reckless behavior, Pariter allocated the new capital injection into additional highly illiquid and risky investments, including more private equity and storage REITs. They once again reassured the Plaintiffs, stating: "Not to worry, as the coupon on these investments far exceeds the interest on the loans."

3.26    Despite these false assurances, and instead of correcting course, Pariter continued to channel Plaintiffs' lifelong savings into toxic, overconcentrated, and illiquid instruments with substantial commisions—all under the pretense that these investments would eventually go public and deliver a tenfold return. Investment prospectuses were either never provided or routinely handed over only after investment decisions had already been made.

3.27    By mid-to-late 2017, when Javier Reyes left Pariter to join SWA, a newly established broker-dealer in Puerto Rico, José and Melanie decided to transfer their portfolio with Defendant Mr. Reyes to this new venture.

**C.     Relevant Facts, SWA and Arkadios**

3.28    Unfortunately, Mr. Reyes, now in SWA, continued the same deceptive practices. The portfolio remained largely unchanged, with additional illiquid and highly risky investments being added. Plaintiffs began requesting clear, written responses regarding their investments and loans to better understand their financial situation. However, SWA refused to provide written answers. Instead, they delayed responses and only addressed concerns verbally in meetings, where topics were often left out, sidestepped, or overshadowed by other matters. SWA simply refused to commit anything to writing.

3.29    By 2019, when the $2,000,000 promissory note matured—now inflated to a staggering $3,300,000 in combined principal and interest within just five years—SWA offered only one piece of advice: sign the documents extending the payment of principal and interest. SWA reassured José and Melanie that Romark and other investments would eventually generate enough returns.

3.30    By 2021, Plaintiffs sought clear answers regarding the status of their investments. However, Mr. Reyes and his team repeatedly dodged their questions, offering few, if any, substantive responses. Plaintiffs demanded answers to several critical questions:

- How had their debt ballooned from $2 million to $3.3 million?

- How could an unnecessary loan grow by 65% in just five years?

- Why had Romark's promised IPO never materialized?

- Why were multiple investments now entangled in bankruptcy proceedings?

Instead of providing sound financial advice or addressing these concerns, SWA devised a deceitful plan.

3.31    On July 28th, 2021, SWA scheduled an appointment for Plaintiffs to visit their offices. However, their objective was clear—to deceitfully placate Plaintiffs' inquiries while blatantly misleading them. SWA presented a PowerPoint presentation which included the following slide:


[Left Blank]

# Net Worth Statement | As of July 28, 2021

| ASSETS: | Jose M | Melanie | Joint | Total |
|---|---|---|---|---|
| **NON-QUALIFIED ASSETS:** | | | | |
| *Cash Alternatives:* | | | | |
| ****************************8315 | -- | -- | $159,459 | $159,459 |
| e-account Casa Guava | -- | -- | $20,697 | $20,697 |
| MULTICUENTA POPULAR | -- | -- | $186,261 | $186,261 |
| | | | | |
| *Taxable Investments:* | | | | |
| ETC Individual ***0455 (ICAP & Leitlock) | -- | -- | $301,436 | $301,436 |
| ETC Joint Account ***0743 | -- | -- | $70,603 | $70,603 |
| GPB Cold Storage TD 941019682 | -- | -- | $121,646 | $121,646 |
| IMC Corporation | -- | -- | $50,000 | $50,000 |
| Romark | -- | -- | $784,590 | $784,590 |
| TD Avory Individual ***6381 | -- | -- | $321,024 | $321,024 |
| TD Individual ***9684 | -- | -- | $2,266,496 | $2,266,496 |
| TD TIC ***9680 | -- | -- | $244 | $244 |
| UBS Bpop | -- | -- | $65,000 | $65,000 |
| | | | | 4,347,456 |
| *Insurance Policies:* | | | | |
| Mass Mutual Jose Sala ***3563 | -- | -- | $3,398,084 | $3,398,084 |
| **Total: Non-Qualified Assets** | -- | -- | $7,745,540 | $7,745,540 |
| | | | | |
| **RETIREMENT ASSETS:** | | | | |
| *Qualified Retirement:* | | | | |
| ETC Ret Plan ***0514 | $108,330 | -- | -- | $108,330 |
| TD Ret Plan ***9682 | $534,220 | -- | -- | $534,220 |
| TD Smart X Ret Plan ***8360 | $390,443 | -- | -- | $390,443 |
| | | | | |
| *Annuities:* | | | | |
| Universal EIA 059152 | -- | $6,897 | -- | $6,897 |
| Universal Equity Index Annuity Annuity #0622639 | -- | $5,524 | -- | $5,524 |
| **Total: Retirement Assets** | $1,032,993 | $12,421 | -- | $1,045,414 |
| | | | | |
| **TOTAL LIQUID ASSETS** | $1,032,993 | $12,421 | $7,745,540 | $8,790,954. |

3.26   In this PowerPoint presentation, SWA falsely represented to the Plaintiffs that they had approximately $9 million in "total liquid assets" and a total net worth of $10 million (including real estate). However, this presentation was deliberately misleading:

- Illiquid and highly risky investments were not priced to market.

- Romark was artificially valued at IPO levels.

- All other toxic and illiquid assets were deceptively categorized as "total liquid assets."

The presentation concluded with the false claim that José and Melanie had a net worth of $10 million. Despite the enormous predatory loan, overconcentration in high-risk assets, and the underfunded whole-life insurance policy, SWA reassured Plaintiffs that there was nothing to worry about, even going so far as to claim that they had more money than when they originally hired SWA. José and Melanie trusted this representation—believing their assets had almost doubled in value.

3.32     Thus, in late 2021, Plaintiffs began the process of fully repaying the outstanding principal and interest of the predatory loan. To achieve this, they injected $850,000 in new capital and instructed SWA to liquidate other assets. By May 2023, the predatory loan was paid in full.

3.33    As the predatory loan was finally off their backs, Plaintiffs requested the updated balance of their portfolio. To their shock and dismay, on May 19, 2023, Mr. Julio Díaz of SWA, via email, disclosed the actual state of their finances. Only $371,000.00 remained and $3.4 million was locked in cash value within the whole-life insurance policy. Upon this revelation, Plaintiffs realized that they had actually lost between $4,000,000.00 $6,000,000.00 dollars; a multi-million-dollar discrepancy compared to the figures fraudulently presented to them in 2021. As a result of this new reality, José and Melanie were forced to stop their monthly $10,000 allowance. José began searching for work.  He sought assistance from both SWA and outside sources to find a way to sustain the life

insurance policy, hoping his wife and children would at least inherit the promised death benefit. José suffered severe stress-related health issues, losing 23–27 pounds, entering psychiatric therapy, and being prescribed medication.

3.34   Ultimately, SWA and Arkadios' house of cards collapsed—exposing their deceptive, Ponzi-like scheme.   Beyond the financial devastation, Plaintiffs suffered irreversible consequences. They had to forfeit the cherished $7,000,000 death benefit that was meant to provide security for José's widow and children.   They lost the $850,000 they used to reduce the loan in 2021–2022.   Perhaps most costly, they lost the opportunity cost of properly managed funds—which could have more than doubled their original $6,750,000 investment.

3.35   On December 29th, 2023, six (6) months later, Plaintiffs filed an Arbitration Statement of Claim per FINRA's Rules and Regulations against Pariter Wealth Management Group, Inc. a/k/a, Pariter Securities, LLC, Arkadios Capital Group, Arkadios Wealth, Inc., Select Wealth Advisors, LLC; Case Id. 23-0002. After several procedural hearings, on November 4th, 2024, the Arbitration Panel dismissed without prejudice the Statement of Claim concluding the following:

> The Motion to Dismiss is hereby GRANTED. The claims asserted by Claimant in this arbitration are dismissed due to ineligibility under FINRA Rule 12206(a).
>
> Respondents Pariter Securities, LLC and Arkadios Capital Group's Motion to Dismiss pursuant to Rule 12206 of the Code is granted by the Panel without prejudice to any right Claimant has to file in court; Claimant is not prohibited from pursuing their claims in court pursuant to Rule 12206(b) of the Code.
>
> […]

The Panel made no determination with respect to Claimant's claims against Pariter Wealth Management Group, Inc., Arkadios Wealth, Inc., and Select Wealth Advisors, LLC.

## IV. FIRST CAUSE OF ACTION
## SECURITIES FRAUD
### (15 U.S.C. §78(j)(b) and 17 C.F.R. 240.10b-5)

4.1    All of the above allegations are realleged and incorporated in their entirety herein. Section 10(b) of the Exchange makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

4.2    The Securities Exchange Commission has promulgated such a regulation, making it illegal to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b–5(b).

4.3    A securities fraud complaint must meet the following six elements: "(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 460-61 (2013) (citation omitted).

4.4     As José and Melanie's financial situation and portfolio became increasingly precarious, all Defendants engaged in a continued pattern of deceit and predatory lending.

4.5     Defendants offloaded toxic, illiquid assets to Plaintiffs for a quick, highly lucrative commission, overconcentrating their portfolio in risky alternative investments and an unfunded whole-life insurance policy.

4.6     As the portfolio deteriorated, Pariter, followed by SWA, and their respective affiliates (with Mr. Reyes always at the helm), pushed Plaintiffs into signing unnecessary and predatory million-dollar loans. The imminent disaster, foreseeable to Defendants, was concealed through a continuous pattern of deceit, including a misleading 2021 PowerPoint presentation.

4.7     If Plaintiff savings had been "well-managed," their current net worth would be approximately $9.5 million, rather than the $3,700,000.00 million they have today (together with the $7,000,000- $10,000,000 death benefit).

4.8     Brokers Francisco Rivera and Javier Reyes handled José and Melanie's accounts under the following promises: (i) their fiduciary responsibilities were paramount; (ii) compensation was fee based which aligned the interests of Defendants with those of Plaintiffs'; and (iii) no commissions would apply.

4.9     Due to Plaintiffs' lack of knowledge about these highly sophisticated and risky financial instruments and the continuous misrepresentations made by Defendants, José and Melanie could not foresee the losses sustained in their portfolio. Their primary goal was to secure their children's future and their own retirement. However, through

continuous deceit and commission-driven products, Defendants sought to profit quickly and consistently at their expense.

4.10    Defendants overconcentrated and mishandled the portfolio for their own benefit, despite the needs and suitability of their clients.

4.11    Rather than protect José and Melanie's savings and future well-being in line with their fiduciary duties, the brokers continued to invest the family's life-long savings in highly illiquid, costly, toxic securities with significant credit, liquidity, and market risks.

4.12    When José and Melanie began their relationship with Pariter and then with SWA, they had no understanding of how whole-life insurance worked or the risks involved in private equity and other highly risky investments. To this day, they still do not understand these instruments, highlighting the clear unsuitability of the investments. Given their lack of knowledge, age, investment profile, and low risk tolerance, Defendants had a fiduciary duty to exercise special care in managing their accounts. Additionally, Defendants continued to explicitly recommend holding these investments, which were negligent, unsuitable, unconscionable, and a clear breach of their fiduciary duties.

4.13    Since the shares of the alternative investments were not registered, listed, or quoted on any nationally recognized market, they were highly illiquid. There was no legitimate reason to recommend such instruments to Plaintiffs, other than the brokers' desire for unusually high commissions. The pool of potential buyers for these instruments in the secondary market was extremely limited, making the true market price secret, volatile, and subject to manipulation by Defendants.

4.14    Defendants' schemes were illegal, tortious, and deceitful, designed with the sole fraudulent objective of generating exorbitant revenues, in violation of their fiduciary duties and with utter disregard for the Plaintiffs' best interests and investment objectives.

4.15    Defendant's conduct in this case demonstrates a complete absence of good faith and compliance with fair dealing and fiduciary standards. Their actions show a total disregard for applicable rules and regulations, including those of FINRA.

4.16    Defendants grew rich through fees and commissions. Defendants sold low-quality alternative investments and an unfunded whole-life insurance policy to the Plaintiffs. These actions created a clear conflict of interest, where fees and commissions took precedence over the clients' needs. This gross conflict of interest put Defendants in the position of choosing between their own financial interests and those of the Plaintiffs. Defendants chose to protect their own.

4.17    Defendants materially breached, without limitation, the following FINRA Rules and Regulations: 2010, 2020, 2060, 2090, 2111, 2114, 2121, 2150, 2165, 2210, 2211, 2231, 2241, 2264, 2269, 3100 series and 3110, 3260, 4200 series, 4210, 4220, 4512, 4521, 5110, 5123 and 5130.

## V. SECOND CAUSE OF ACTION
### Supplemental Claim:
### Violations to the Banking Act of Puerto Rico,
### 7 LPRA Sec. 1 et seq., 111(a) and/or 10 LPRA Sec. 1 et seq.

5.1    All of the above allegations are realleged and incorporated in their entirety herein. Defendants illegally engaged in a continuous pattern of securing loans with affiliate or related banks not authorized to do business in Puerto Rico. In other words, not only were the predatory loans unsuitable and fraudulent in nature, but they were also

illegal, as they were opened with financial institutions not authorized to operate in Puerto Rico.

5.2     These predatory loans and/or margin accounts: (i) increased the Plaintiffs' market and credit risk; (ii) increased the revenues of Defendants and its financial advisors and/or brokers through extra commissions and fees generated by the purchase and sale of more securities; (iii) increased Plaintiffs' costs and expenses in commissions, mark-ups, and mark-downs; (iv) increased the revenues of Defendants from management fees of assets that were illegally inflated; (v) generated profits and loan revenues from interest charged by an unauthorized bank affiliate; (vi) artificially inflated the market value and liquidity of the portfolio; and (vii) breached the basic principles of suitability.

5.3     Defendants unjustly enriched themselves and their financial advisors and brokers through the conduct described above, at the expense of the Plaintiffs. Defendants received significant fees, commissions, and other economic benefits from the sale of the instruments outlined in this Complaint.

5.4     Under the Banking Act of Puerto Rico, 7 LPRA Sec. 111(a), no bank can engage in lending activities unless it is registered with the Office of the Commissioner of Financial Institutions (OCIF). Additionally, under 7 LPRA Sec. 181, any bank authorized to do business in Puerto Rico must comply with a comprehensive list of requirements. Plaintiffs invoke these statutes for purposes of establishing the illegal nature, defendant's callous disregard for laws, rules and regulations, as well as the transaction's nullity.

5.5     On good faith belief basis, Plaintiffs hold that the lenders involved in the captioned transactions were not authorized banks or financial institutions in Puerto Rico, which is part of the continuous deceitful, fraudulent and negligent pattern concerning

Plaintiff's portfolio management. The Financial Intermediaries Act of Puerto Rico, 7 LPRA Sec. 1071 et seq., renders such out-of-jurisdiction loans illegal. According to 7 L.P.R.A. § 1073, no loan concessionaire may make loans in Puerto Rico unless it is authorized to do so by the OCIF. Section 7 L.P.R.A. § 1087 outlines penalties for concessionaires that fail to comply with this Act, and Section 7 L.P.R.A. § 1085 grants the OCIF the authority to promulgate rules and regulations to enforce these provisions.

5.6    Under Regulation 8348, promulgated by the OCIF, Article 3 makes it illegal to originate loans in Puerto Rico without the proper license. Additionally, Article 13 lists 17 practices that are prohibited, several of which may have been violated in this case.

5.7    Article 14 of Regulation 8348 specifies penalties, including fines and civil remedies: "Each violation of the provisions of this Regulation may be sanctioned with an administrative fine, not less than one hundred dollars ($100.00) nor more than five thousand dollars ($5,000.00), or any other remedy deemed in the best interest of the client or the public interest, including but not limited to reimbursement or restitution of money." This regulation allows for civil remedies, including full reimbursement or restitution for the client's benefit.

5.8    Furthermore, in the 2010, *Piovanetti v. Tauma,* 2010 TSPR 61*,* the PR Supreme ruled that making loans without a valid license, and without any exceptions, constitutes an illegal act. As a result, any such transactions in violation to the PR Banking Act are deemed null and void, and full restitution or reimbursement is warranted.


**VI. THIRD CAUSE OF ACTION**
**Supplemental Claim:**
**Fraud and Breach of Contract under Puerto Rico law**

6.1     All the above allegations are realleged and incorporated in their entirety herein. "In order to prove fraud under Puerto Rico law, a plaintiff must establish: (1) that a false representation was made; (2) that the plaintiff reasonably and foreseeably relied thereon; (3) that the plaintiff was injured by his reliance; and (4) that the defendant intended to defraud the plaintiff." *Microsoft Corp. v. Computer Warehouse, 83 F. Supp. 2d 256, 262 (D.P.R. 2000) (citing Wadsworth, Inc. v. Schwarz–Nin, 951 F.Supp. 314, 323 (D.P.R.1996)).*

   A.  **Investment Advisers Act of 1940 (although no private cause of action is recognized, Defendants' violations to this act forms part of their continuous deceitful pattern of illegal, fraudulent and negligent conduct)**:

6.2     Under federal law, an investment adviser is a fiduciary. As fiduciaries, investment advisers owe their clients a duty of care. *SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194 (1963)*. Investment advisers have antifraud liability with respect to prospective clients under section 206 of the Advisers Act. 15 U.S. Code § 80b–6 – "Prohibited transactions by investment advisers".   The Advisers Act establishes a federal fiduciary duty for investment advisers. *Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 17 (1979) ("Transamerica Mortgage v. Lewis")* ("§ 206 establishes federal fiduciary standards to govern the conduct of investment advisers.") (quotation marks omitted); *Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 471, n.11 (1977)* (in discussing *SEC v. Capital Gains,* stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"); *SEC v. Capital Gains,* supra footnote 2; Amendments to Form ADV,

Investment Advisers Act Release No. 3060 (July 28, 2010) ("Investment Advisers Act Release 3060") ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own," citing *Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106* (Jan. 31, 2003) ("Investment Advisers Act Release 2106")).

6.3    The investment adviser's fiduciary duty is broad and applies to the entire adviser-client relationship. The SEC has previously recognized the broad scope of section 206 of the Advisers Act in a variety of contexts. *See, e.g., Investment Advisers Act Release 2106, supra footnote 15; Timbervest, LLC, et al., Advisers Act Release No. 4197* (Sept. 17, 2015) (Commission Opinion) (" [O]nce an investment advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the advisory relationship."); see also *SEC v. Lauer, 2008 WL 4372896, at 24 (S.D. Fla. Sept. 24, 2008)* ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'"); Thomas P. Lemke & Gerald T. Lins, Regulation of Investment Advisers (2013 ed.), at § 2:30 ("[T]he SEC has … applied [sections 206(1) and 206(2)] where fraud arose from an investment advisory relationship, even though the wrongdoing did not specifically involve securities.").

## B.  Puerto Rico's Uniform Securities Act, 10 L.P.R.A. § 851, et seq

6.4    Puerto Rico's Uniform Securities Act, 10 L.P.R.A. § 851, et seq. in its Sections 851 and 852, prohibits any person or investment adviser from deceitful and fraudulent practices by employing any device, scheme, or artifice to defraud the other

person, or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person. *U.I.A. v. Santander Securities, 2024 TSPR 81, Méndez Moll v. AXA Equitable Life, 2019 TSPR 104, Josefina Olivella Zalduondo, et al. v. Seguros de Servicios de Salud y otros, 187 D.P.R. 625 (2013).*

### C. Breach of contract pursuant to Puerto Rico's Civil Code, 31 LPRA, et seq., and Article 1864 of the previous Code.

6.5    Under Puerto Rico law, indemnification can be proper as an accessory remedy "where the contractual obligations are mutual and reciprocal." Holsum de Puerto Rico, Inc. v. Compass Indus. Grp. LLC, Civ. No. 18-02004 (JAW), 2022 U.S. Dist. LEXIS 183427, 2022 WL 5168741, at *4 (D.P.R. Oct. 5, 2022) (internal citations omitted).

6.6    It is well settled Puerto Rico case law that Securities Law causes of action (such as this one and including FINRA's) are not exclusive and run concurrent and are in addition to other causes of action, such as a breach of contract claim. To the extent a cause of action occurs under a breach of contract claim and such breach of contract claim is alleged prior to the amendment to our Civil Code in 2020, the statute of limitation is 15 years.   Please see U.I.A. v. Santander Securities, 2024 TSPR 81.

6.7    Defendants and Plaintiffs signed multiple contracts were fiduciary duties were specifically included therein, such as: (i) 1.2 Discretion and Trading Authorization. The Investment Adviser will have full DISCRETIONARY power and authority **to supervise and direct** the investment of the assets in the Account, including the power and authority to buy, sell, and otherwise effect transactions in any Investment, all without prior consultation with Client. The Investment Adviser will exercise this authority, at its sole discretion, in accordance with the Client's investment objectives, and (ii) 1.3

Investment Advisory Services. The Investment Adviser (a) shall **supervise and direct** the investments of the Account, in accordance with the investment objectives of the Client; (b) shall **appraise and review**, at reasonable intervals during the period of this Agreement, investment of Accounts, as initially accepted by the Investment Adviser, together with all additions, substitutions and alterations thereto; and (c) shall render to the Client a quarterly statement of the Account holdings and the investment performance of the Account.

### VII. FOURTH CAUSE OF ACTION
**DAMAGES and JOINT and SEVERAL CIVIL RESPONSIBILITIES and LIABILITIES of Mr Rivera and Mr Reyes and their conjugal partnerships 31 LPRA Sec 1 et seq, as amended, case law thereunder and the Federal Securities laws, 15 USC Sec. 78(t)(a), 14 L.P.R.A. Sec 3926, 3956 and 3969.**

7.1    All the above allegations are realleged and incorporated in their entirety herein. 15 USC Sec. 78(t)(a) states: (a)Joint and several liability; good faith defense. Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

7.2    Sections 14 L.P.R.A. Sec 3926, 3956 and 3969 make any professional holding a license in Puerto Rico both personally, jointly and severally liable to any aggrieved party together with the corporation or limited liability company who rendered the services subject to any professional complaint.

7.3    Pursuant to the fraud statutes of both federal and state securities laws and regulations, Plaintiffs respectfully request damages as per the well-managed portfolio computation doctrine, plus legal costs and expenses, including filing fee and expert witness costs.

7.4    The aforesaid acts and omissions of the brokers, investment advisers, Mr. Rivera, Mr. Reyes, Pariter and SWA, and their respective affiliates, constitute gross violations of the fiduciary duties and duties of good faith and fair dealing that financial advisors owe their clients under the laws of the United States, Puerto Rico, FINRA and in general.

7.5    The brokers, investment advisers, Mr. Rivera, Mr. Reyes, Pariter and SWA, and their respective affiliates, wrongfully managed Plaintiffs' accounts and did it with scienter and, in creating and implementing illegal and fraudulent acts, they are jointly and severally responsible under Section 10-B and the supplemental laws invoked in this section and in this Complaint. The brokers, investment advisers, Mr. Rivera, Mr. Reyes, Pariter and SWA, and their respective affiliates caused damages to José and Melanie in utter disregard of their best interests, by making the aforesaid unsound, unauthorized, unsuitable, tortious and grossly negligent investments in highly risky investments and in an unfunded whole-life insurance policy, and by explicitly recommending to Plaintiffs to embark and renew a predatory loan, and to continue holding these securities until they had lost most of their liquidity and value, among other conducts.

7.6    The brokers, investment advisers, Mr. Rivera, Mr. Reyes, Pariter and SWA, and their respective affiliates all breached their contractual obligations to José and Melanie in that their conduct in making clearly unsuitable and non-diversified investments

to a retiree couple was a breach of contract under the laws and case law of Puerto Rico: incompetent, illicit, unfair, negligent, malicious, unsuitable, tortious, fraudulent, improperly authorized and grossly negligent. Moreover, all of them misrepresented and lied about the terms and conditions of the whole life insurance policy to make themselves rich and failed to explain the true nature of the alternative investments and their risks, while creating a fraudulent account with illegal loans.

7.7    Given the facts of this particular case, Plaintiffs respectfully request full reimbursement and redress of all the aforesaid losses and/or the rescission of all the aforesaid unauthorized transactions and other proper remedies.

## VII. FIFTH CAUSE OF ACTION
### Punitive Damages
### *Art. 1538 of the PR Civil Code 2020*

8.1    Defendants' egregious, serious and callous negligent conduct merits the imposition of punitive damages, sought herein. Punitive damages should be imposed against the defendants in an additional sum equal to the amount of the damage caused, pursuant to Art. 1538 of the PR Civil Code.

## VIII. SIXTH CAUSE OF ACTION
### Costs and Attorney Fees

9.1    The Plaintiffs are entitled to damages for costs and attorneys' fees under Rule 44.1 of the Code of Civil Procedure.

9.2    The Plaintiffs are also entitled to damages for costs and attorneys' fees under Rule 44.1 of the Code of Civil Procedure, as Defendants acted in bad faith.

## IX. PRAYER FOR RELIEF

Plaintiffs request the following relief from this Honorable Court:

A. $2,500,000.00, of which $1,250,000.00 is tied to net-out-of-pocket losses plus, as disgorgement, all commissions and fees earned since and including the year 2009 (unknown as of this date and subject to discovery but currently estimated at $1 million dollars); or

B. $9,500,000.00 based on the well-managed portfolio account remedy, which states that an investor may recover what she/he would have made during the same time period; or

C.  $4,000,000.00 in statutory damages and/or rescission pursuant to Puerto Rico law. Rescission damages for breach of contract (Pariter and SWA's fiduciary duties) are specifically allowed pursuant to PR's civil code and the Supreme Court case law.   Likewise, violations to the Office of Commissioner of Financial Institutions of Puerto Rico rules and regulations allow for rescission damages; or

D. This same amount, or $4,000,000.00 - $6,000,000.00, for having grossly and willfully misrepresented Sala and Rossello's net worth in that 2021 power point presentation.

E.     Punitive damages should be imposed against the defendants in an additional sum equal to the amount of the damage caused, pursuant to Art. 1538 of the PR Civil Code.

D.     Declare null and void the predatory loans involved in the captioned transactions.

E. That this Honorable Court declares Defendants acted recklessly making Plaintiffs entitled to costs, expenses, pre-judgment interest and a reasonable amount of attorney's fees.

F.  Plaintiffs Demand a Jury Trial on All Issues so Triable.

Respectfully submitted.

In San Juan, Puerto Rico this 14th day of February of 2025.

| s/ JOSE ALBERTO MORALES BOSCIO | /s FRANCISCO A. FELIU NIGAGLIONI |
|---|---|
| JOSÉ ALBERTO MORALES BOSCIO - 220614 | FRANCISCO A FELIU-NIGAGLIONI – USDC NO. 308801 |
| Morales Boscio Law Offices<br>VIG Tower 1500,<br>Ave. Ponce de León 1225<br>San Juan, PR 00907<br>E-mail: jamb@mbprlaw.com<br><br>Phone: 787.473.7778 | Business Law PR, LLC<br>361 Angel Buonomo St.<br>César Castillo Bldg., Suite 200<br>San Juan, PR 00918<br><br>PO Box 192928<br>SJ, PR 00919<br><br>E-mail: ffeliu@businesslawpr.com<br>        paco_feliu@icloud.com<br><br>Phone: 787.404.9805 |